121 N.J. Super. 261 (1972)
296 A.2d 562
THE SINGER COMPANY, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
LARRY K. GARDNER, DEFENDANT.
Superior Court of New Jersey, District Court, Burlington County.
Decided October 27, 1972.
*262 Appearances:
Messrs. Dimon, Haines & Bunting (Mr. William R. Wood appearing) Attorneys for Plaintiff;
Messrs. Farr, Brandt, Haughey & Penberthy (Mr. David A. Kasen appearing) Attorneys for Defendant.
WOOD, A.C., J.C.C.
This is an action in replevin in which plaintiff The Singer Company seeks judgment for possession of certain articles of merchandise sold to defendant, and by way of damages, the balance of the purchase price of said articles allegedly remaining due and unpaid. Defendant denies any indebtedness to plaintiff. He contends that the agreement between him and plaintiff be declared void as unconscionable and by reason of the exaction of wrongful charges by plaintiff in violation of the Retail Instalment Sales Act, N.J.S.A. 17:16C-1 et seq. By way of counterclaim defendant demands damages for the alleged wrongful seizure by plaintiff of the goods in question.
*263 On January 15, 1969 defendant purchased from plaintiff a sewing machine for the agreed purchase price of $400. He paid $65 down on account of the purchase price with the balance to be paid in instalments. A sales slip was prepared setting forth the sale, the price (plus sales tax of $12), the down-payment, the balance of $347 remaining due, and showing the "agreed monthly payment" as $14.
On January 21, 1969 defendant signed a "Singer Credit Application" setting forth on the face thereof personal data usually called for on such applications. On the reverse of said application form there appears in reasonably legible type an agreement headed "The Singer One to Thirty-six Credit Plan Agreement." This agreement sets forth the terms of instalment payments made on this so-called "credit plan."
On or about February 8, 1969 defendant purchased a Singer U-43 vacuum cleaner for the sum of $70. The sales slip covering the transaction indicates a payment of $2.10 on account (the amount of the sales tax), a balance due of $70 and agreed monthly payments of $15.
On May 21, 1969 defendant purchased two more vacuum cleaners, a U-43 model for $69.95 and a C-10 model for $79.95, a total purchase price of $149.90. This sales slip showed payment of $4.50 (the amount of the sales tax), the balance of $149.90, and no amount of agreed monthly payments.
Defendant made monthly payments on account of these purchases until July 1969. Thereafter payments were made sporadically until April 24, 1971, when a payment of $100 was made, bringing the amount paid on account to a total of $469. No payments on account were made thereafter. Certain attempts at collection by representatives of plaintiff having been unsuccessful, this action in replevin was instituted by the filing of the complaint on July 13, 1971. A writ of replevin was issued and there were seized thereunder the sewing machine and two vacuum cleaners. No notice of the repossession was given to defendant.
*264 The sewing machine was resold by the plaintiff on April 4, 1972 for $172.95. One U-43 vacuum cleaner was resold on May 27, 1972 for $7.99. No notice was given to defendant of the resales and it is to be noted that such sales were prior to the entry of any judgment in this action. There is no evidence as to whether the resale prices represented the then fair market value of the goods sold. In any event, defendant was credited with the sum of $180.94 realized from the repossession sales. Plaintiff has thus credited defendant with payments totalling $469.60 and proceeds of resales in the sum of $180.94, making total credits of $650.64. The other vacuum cleaner seized under the writ of replevin has not been sold and nothing is credited to defendant by reason of its repossession.
It is to be noted that while the complaint alleges sale of two vacuum cleaners to defendant, the evidence and testimony disclose the sale of three vacuum cleaners, one February 8, 1969 and two on May 21, 1969. Defendant testified that he paid cash in full for the vacuum cleaner purchased in February. The records produced by plaintiff indicate no such payment. Defendant says he was given a receipt for the purchase. He did not produce such receipt, saying he gave it to his mother in Philadelphia for whom he bought the machine. I conclude that the sale in question was not a cash sale as contended by defendant. Defendant claims that he made certain payments with which he was not credited. I find that such payments are not established and I conclude that the charges and credits as stated by plaintiff must be accepted as correct.
Plaintiff's claim against defendant, then, is summarized as follows:

 TOTAL CHARGES.
 Purchases $619.60
 Sales taxes 18.60
 Service charges 228.87
 (time-price differential)
 Credit life insurance 3.27 $870.64
 ____

*265
 TOTAL CREDITS.
 Payments $469.60
 Proceeds from repossession sales 180.94 650.54
 ______ ______
 TOTAL DUE $220.10

Defendant contends that the transactions were retail instalment sales, and fall within the provisions of the Retail Instalment Sales Act, N.J.S.A. 17:16C-1 et seq. He contends that defendant violated the provisions of the act in that:
(1) The contract failed to set forth the particulars required by N.J.S.A. 17:16C-27.
(2) The effective interest, or time-price differential, amounts to an annual rate of 18%, although such interest or time-price differential is limited by the act to 10%, N.J.S.A. 17:16C-41.
(3) Particulars as to separate items were not set forth in additional statements annexed to the contract, as required by N.J.S.A. 17:16C-28.
(4) Defendant was not informed as to allocation of payments or balances due on individual items, as required by N.J.S.A. 17:16C-29.
Defendant therefore urges that the contract be held unconscionable and void, and thus unenforceable under N.J.S. 12A:2-302.
Plaintiff concedes that the provisions of the Retail Instalment Sales Act, including the limitation of 10% on the time-price differential, have not been complied with. It contends, however, that these transactions are not retail instalment sales but are "retail charge account" sales, and do not come within the provisions of the act. The principal issue in this case is whether the transactions are retail instalment sales subject to the provisions of N.J.S.A. 17:16C-1 et seq.
Defendant also contends that the seizure of the goods by plaintiff under the writ of replevin was wrongful since it was made without notice or an opportunity by defendant to be *266 heard, and that the replevin statute is unconstitutional. Cf. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).
Instalment and conditional sales contracts, providing for the payment of an amount in excess of the purchase price for the privilege of paying such price in instalments (commonly referred to as a "credit service charge" or "time-price differential") have long been recognized as distinct from loans and thus to be exempt from the limitations of the usury statute, N.J.S.A. 31:1-1 et seq., the rationale of this distinction being that they are not contracts for the "hire of money," wherefor the usury statute does apply. That such distinction may leave consumers and purchasers of goods on credit in a position highly vulnerable to excessive charges has been increasingly recognized, and, since 1948, the Legislature has addressed itself to the problem of retail credit buying, Steffenauer v. Mytelka & Rose, Inc., 87 N.J. Super. 506 (Ch. Div. 1965). In 1960 it adopted the Retail Instalment Sales Act, N.J.S.A. 17:16C-1 to 60, for the purpose of protecting consumers from abuses by retail sellers respecting charges for making instalment purchases. By N.J.S.A. 17:16C-1(b), a "retail instalment contract" is defined as follows:
"Retail installment contract" means any contract entered into in this State between a retail seller and a retail buyer evidencing an agreement to pay the retail purchase price of goods or any part thereof, in 2 or more installments over a period of time, and pursuant to which title to or a lien upon the goods is retained or taken by the retail seller for the payment of the retail buyer's obligation.
The act sets forth, among other things, detailed requirements as to the information to be included in retail instalment sale contracts, including the cash price, the down payment, the cash balance, the amount of the official fees, the principal balance, the time price differential, the time balance, the number of instalments and the amount and due *267 date of each instalment. It further provides that the time-price differential shall not, for goods other than automobiles, exceed the rate of 10% per year.
By N.J.S.A. 17:16C-29 the act provides that where subsequent purchases are added to the original agreement, payments thereafter shall be considered as allocated among all purchases; and before repossessing any goods for default the seller must actually allocate all payments. Any goods which have been fully paid for are the absolute property of the buyer and not subject to repossession for any subsequent default.
No reference was made in the act to forms of deferred payment for merchandise not coming within the above definition. However, a distinction was recognized between retail instalment sales as defined in the act and retail charge account or revolving credit plans adopted by many large retail merchandisers such as department stores; and the restrictions applicable to retail instalment contracts were held not to apply to retail charge account transactions, although these are obviously simply another form of time-price differential financing. In Sliger v. R.H. Macy & Co., 59 N.J. 465, 467 (1971), the operation of such an account is described as follows:
[The customer] presents his charge card and the sale is recorded for billing purposes subject to the prior agreement. The purchase is recorded on the customer's account and a monthly statement is mailed to him while there remains an unpaid balance. It is understood that the customer may pay the unpaid balance of his account in full within 27 days of the monthly statement sent to him and thereby avoid a finance charge; he may pay installments over a longer period in accordance with the payment schedule determined by the size of his balance. The minimum monthly payment is 10% of the balance due. In exercising his choice to pay over the longer period the purchaser agrees to pay a "finance charge" of 1 1/2% per month.
The Supreme Court in Sliger, while recognizing and upholding the revolving charge account sales there considered, also recognized the apparent need for further control and regulation of this type of transaction and noted that legislation *268 dealing with same was even then before the Legislature.
Such legislation was enacted in 1971, in the form of amendments to the Retail Instalment Sales Act, which specifically defined and distinguished retail charge accounts and limited the time-price differential to be exacted thereunder to 1 1/2% per month on the first $700. of such accounts and 1% per month on the excess. However, these amendments had not been enacted when the transactions here considered took place, and plaintiff can hardly contend that they are applicable to these transactions. But plaintiff does argue that they evince legislative recognition and tacit approval of retail charge accounts as described in Sliger, supra. It argues that these transactions were retail charge account transactions and must be upheld as valid accordingly.
There are, it appears, two principal differences between retail instalment sales and retail charge account (or retail credit card) transactions.
1. In charge account transactions the customer is not bound to a rigid payment schedule, as is the case in instalment sale contracts. Rather, the customer pays a minimum amount each month and is charged at the monthly rate on the balance. But, in retail charge accounts, the customer may avoid any charge by paying the balance currently due within the billing period, whereas this privilege is not accorded in retail instalment transactions in which the entire time balance must be paid whether in a lump sum or over the full period of the contract.
2. In instalment sale transactions the seller retains property rights in the goods sold, together with the right of repossession in the event of default until the full time balance is paid. This is not usually true of retail charge account sales.
Let us, then, examine the contract here at issue.
1. The customer is issued a "Singer Credit Card." The card is to remain "the property" of Singer and is to be returned by the customer upon "termination" of the account.
*269 2. Payments are to be "the larger of" the agreed monthly payment or "the company's minimum monthly payment listed on an annexed schedule." The scheduled monthly payment does not decline as the unpaid balance is reduced.
3. Title to the goods purchased remains in the company until the unpaid balance of each separate purchase is fully paid. The goods may not be encumbered or disposed of without the consent of the seller.
4. In the event of default in payment the entire unpaid balance shall, at the seller's option, become immediately due and is to be paid on demand or the seller may "in the manner and as provided by law, retake any goods not then paid for" and pursue other remedies, including recovery of attorney's fees.
It is readily apparent that the transaction or transactions described and called for by this contract were the very type of transaction which the Retail Instalment Sales Act is designed to cover. It follows that they were retail instalment sales and as such are covered by the act. The use of the device of a "credit card" was a subterfuge designed to avoid the provisions of the act and enable the seller to impose a time-price differential greater than that permitted by the act. It is noteworthy that the purchaser was given no option as to any method or plan of payment. He did not go to Singer with the intent of opening a continuing charge account like those employed by department and variety stores. He desired to purchase a number of major appliances and to pay for them in instalments. He was tenderd the application which he completed and was then sold the merchandise as a "credit card" customer. He was, in effect, forced into a form of transaction which he neither requested nor understood. Moreover, he was never furnished the information required by N.J.S.A. 17:16C-27  particularly the amount of the time-price differential and the amount of the time balance on his purchases. When he defaulted in payments it might well be that the purchase price of at least one of the vacuum cleaners had been paid, or very nearly paid, in full. *270 No effort was made to determine this, and he was given no opportunity to redeem any of the items repossessed. This is in violation of N.J.S.A. 17:16C-29. Moreover, a contract which keeps a balance due on every item until all items, whenever purchased, are liquidated, is unconscionable. Williams v. Walker-Thomas Furniture Co., 121 U.S. App. D.C. 315, 350 F.2d 445 (1965).
I therefore conclude:
1. The transactions were retail instalment sales and were governed by the Retail Instalment Sales Act.
2. The so called "Credit Card Plan" was a subterfuge, designed to enable Singer to evade the provisions of the Retail Instalment Sales Act.
3. In the crucial respects mentioned plaintiff violated provisions of the Retail Instalment Sales Act to the severe detriment of defendant.
It follows that the contract must be declared unconscionable, and as such void and unenforceable. N.J.S.A. 12A:2-302. It remains therefore to determine the consequences in the light of this conclusion.
Plaintiff, under its writ of replevin, repossessed the sewing machine and two vacuum cleaners. The sewing machine and one vacuum cleaner have been resold. One vacuum cleaner remains in the possession of plaintiff. The third vacuum cleaner was not replevied and presumably remains in the possession of defendant. Defendant demands damages on his counterclaim for the unlawful seizure of the property. However, defendant had possession and, of course, the use of all the goods for 2 1/2 years prior to their seizure. His payments were admittedly sporadic and in default. I conclude that there is no means of fairly assessing damages in favor of defendant and against plaintiff and that the solution which will most nearly do substantial justice as between the parties is to leave them where they stand. Accordingly, judgment will be entered dismissing the complaint and likewise dismissing the counterclaim.
*271 In the light of these conclusions I do not consider it necessary further to consider the constitutionality of the Replevin Act, N.J.S.A. 2A:59-1 et seq. Cf. Grossman Furniture Co. v. Pierre, 119 N.J. Super. 411 (Cty. D. Ct. 1972).
Judgment accordingly. No costs.