179 N.J. Super. 596 (1981)
433 A.2d 439
ROBERT W. TURNER AND JAMES R. STERNIK, PLAINTIFFS-APPELLANTS,
v.
ALDENS, INC., AN ILLINOIS CORPORATION, DEFENDANT-RESPONDENT. KATHRYN A. PFLUMM, PLAINTIFF-APPELLANT,
v.
SPIEGEL, INC., AN ILLINOIS CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 3, 1981.
Decided July 10, 1981.
*598 Before Judges FRITZ, POLOW and JOELSON.
Jeffrey W. Herrmann argued the cause for all appellants (Cohn & Lifland, attorneys; Peter S. Pearlman of counsel).
Morrill J. Cole argued the cause for respondent Aldens, Inc. (Cole, Berman & Belsky, attorneys).
Francis E.P. McCarter argued the cause for respondent Spiegel, Inc. (McCarter & English, attorneys; E.P. McCarter and Lanny S. Kurzweil of counsel and on the brief).
The opinion of the court was delivered by FRITZ, P.J.A.D.
Each of these appeals, in which the operative facts are essentially identical, presents the single issue of whether the Retail Installment Sales Act (RISA), N.J.S.A. 17:16C-1 et seq., is applicable, on the basis of extraterritorial effect, to the "revolving charge accounts" maintained by defendants for use by plaintiffs. In the absence of objection from counsel, we have consolidated the appeals.[1]
Both parties in each action brought motions in the trial court for summary judgment. In an oral opinion the trial judge granted the motions of defendants, relying solely on Sliger v. R.H. Macy & Co., Inc., 59 N.J. 465 (1971) as authority for his determination. His opinion is somewhat equivocal. It appears to be premised in part, at least, on his reading of Sliger as directing that courts not interfere with legislative prerogative absent an "egregious situation" involving something more than the "no great disparity" between New Jersey RISA rates and those of the other state involved, in this case, Illinois. Recognizing *599 the single question presented of whether the Legislature intended RISA to have extraterritorial application, he said:
The problem in this state, however, is that the New Jersey Supreme Court decided the case of Sliger v. R.H. Macy & Co., Inc., 59 New Jersey, Page 465 (1971). If that case had not been decided as it was decided, and even with or without the statute, the Court might be free to conclude differently or take a different view of the particular matters that are before it. Of course, I am bound by that decision, and I conclude that essentially based on the analysis and the applicability of the Supreme Court decision in Sliger v. R.H. Macy & Co. that I have cited, that the present New Jersey statute does not apply in the case before me, so that means that obviously I could not grant the relief requested by the plaintiff.
... The Sliger case indicated that absent statutory provision, either express or implied, that the finance charge rates on retail charge accounts as to out-of-state sellers or in-state sellers would be a problem to regulate in New Jersey, and we are talking about a situation where there is no great disparity of rates. That was found not to be regulated at the time of the R.H. Macy decision. The Court said then that the Legislature could fill the void and that absent  and I conclude also  that absent a clear violation of public policy and absent a legislative expression, although I think either one could be in the alternative there and not conjunctively, there is no basis for the Court to impose its own views.
....
I want it clear that the decision I am making here this morning  and I have a few other things I have to say  is not meant to imply or suggest an out-of-state lender who sues in the New Jersey courts could collect higher interest charges, necessarily. That may be a different situation. It may be that an out-of-state company, mail order, such as the defendants in the two motions that are really being considered here might well be limited in such cases to the New Jersey rates on a lawsuit. I think, however, in terms of the agreement between the parties, they are free to agree in most cases as to which law should apply and they have done that and there is, obviously, nothing so shocking in what is before me that I could conclude that public policy would require that the Courts of this state step in at this particular point and say the New Jersey Retail Installment Sales Act is to have an extraterritorial application. It is up to the Legislature to act at this point. It is not up to the province of the Court unless there is some egregious situation which clearly, on its face, would create such a disparity that this Court, as a matter of equity, or based on public policy grounds, should not enforce the law of another jurisdiction on traditional rules.
... But for the Sliger case that I cited, as I said, it might be possible to find different public policy in this state, but based on that decision, I cannot make that determination here.
*600 We believe the determination avoids the issue. The Legislature has acted. It enacted RISA. Our obligation is to determine whether its intention at that time[2] was to give that statute extraterritorial effect. Put another way, we must decide whether the Legislature meant the limit it imposed on time price differentials (N.J.S.A. 17:16C-44.1) to apply to revolving charge account contracts in which the retail buyer, who is in New Jersey, agrees with the retail seller, whose only contact with New Jersey (other than the shipping here of goods ordered) is its solicitation of business by catalogues mailed to or otherwise provided the buyers and others in New Jersey, that the statutes of the foreign state shall apply. In this case the statutes of the foreign state permitted a higher time price differential than did the statutes of New Jersey. The charge exceeded that permitted in New Jersey, but was in compliance with the law of the foreign state. Our principal disagreement with the trial judge springs from our respective differing views on the import of Sliger. In terms of the case before us, he apparently believes Sliger says, in essence if the statute does not expressly state that it is to have extraterritorial effect, then that must be left to a later express legislative decree. We do not conceive that to be mandated by Sliger, and believe the principle runs afoul of well-settled law.
It is true that at first blush Sliger appears quite apposite. There a usury statute was held not to be controlling with respect to time price differential payments, the Supreme Court being satisfied that the interplay between a "time-price doctrine [which] is firmly imbedded in this state" with the "element of *601 reliance upon that doctrine" and the usury statute be left "with the Legislature, the author of the usury laws." 59 N.J. at 469.[3]
Here we have no such choice. Here we are called upon to determine, on an absolute rather than a relative basis, the perimeters of effectiveness of a statute. In such circumstance it becomes the duty of a court to fathom as well as it can the intent of the Legislature in the enactment of the legislation. "The goal of the interpretative process is the intent of the Legislature." State v. Provenzano, 34 N.J. 318, 322 (1961).
It is well settled that the law of the state chosen by the parties will be honored so long as that choice does not contravene a fundamental policy of New Jersey. Crinnion v. Great Atlantic & Pacific Tea Co., 156 N.J. Super. 479, 483 (App.Div. 1978); Knollmeyer v. Rudco Industries, Inc., 154 N.J. Super. 309, 312-313 (App.Div. 1977), certif.den. 77 N.J. 477 (1978); see Restatement, Conflict of Laws 2d, § 187 at 561. Nevertheless, "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement, supra, § 6(1) at 10.
We are of the opinion that our Legislature intended to offer New Jersey consumers the protection of RISA no matter from where the seller deals, and that this intent constitutes a statutory directive respecting choice of law. We believe that a contrary conclusion would contravene fundamental policy of this State as it appears documented in RISA. Thus we hold that that statute must be applied here despite the "election" of the parties in this contract of adhesion (see Vasquez v. Glassboro Service Ass'n, Inc., 83 N.J. 86, 104 (1980)) to look to Illinois law.
As we noted in Oxford Consumer Dis. Co. of No. Phila. v. Stefanelli, 102 N.J. Super. 549 (App.Div. 1968), mod. 104 N.J. Super. 512 (App.Div. 1969), mod. 55 N.J. 489 (1970), app.dism. 400 U.S. 808, 91 S.Ct. 45, 27 L.Ed.2d 38 (1970):

*602 Legislative intent can be discerned by background circumstances revealing the evil sought to be remedied and as thus illuminated may be read into the statute by implication with the same effectiveness as though expressly declared therein. [102 N.J. Super. at 565]
We have no doubt that the evil sought to be remedied by N.J.S.A. 17:16C-1 et seq. is the charging of excessive interest to New Jersey consumers. That evil is of such a nature that we are confident the Legislature did not intend to discriminate on the basis of the source of supply. Rather, it endeavored to protect residents of this State from that evil irrespective of whether its source was in-state or out-of-state.
Objective evidence of such an intent may be found in a comparison of the definitions of a "retail charge account" and a "retail installment contract." N.J.S.A. 17:16C-1(r) provides:
"Retail charge account" means any account ... established by an agreement which prescribes the terms under which a retail buyer may from time to time purchase or lease goods or services which are primarily for personal, family or household purposes, and under which the unpaid balance thereunder, whenever incurred, is payable in one or more installments and under which a time price differential may be added in each billing period as provided herein.
On the other hand N.J.S.A. 17:16C-1(b), describing a "retail installment contract," specifically limits that definition to "any contract, other than a retail charge account or an instrument reflecting a sale pursuant thereto, entered into in this State between a retail seller and a retail buyer" (emphasis supplied). We are satisfied that the failure to restrict the definition of retail charge accounts at least to contracts "entered into in this State" manifests an intention that the laws respecting those contracts be given extraterritorial effect.[4]
Oxford Consumer Dis. Co. of No. Phila. v. Stefanelli, supra, dealing with the Secondary Mortgage Loan Act (N.J.S.A. *603 17:11A-1 et seq.), provides remarkable similarities. Its language is instructive:
... While it is true that the text of the statute does not express any conditions or qualifications of its applicability in terms of the place of making of the loan, the residence of the lender corporation or the borrower, or even the location of the mortgaged property, the manifest purpose of the legislators in enacting, and of the Governor in approving, this statute was to protect New Jersey residents from overreaching mistreatment of them by out-of-state as well as local lenders taking back secondary mortgages on New Jersey residential real property. [102 N.J. Super. at 565]
So here with regard to charges exceeding those thought by the Legislature to be the maximum which the New Jersey resident should be expected to pay.
In a case in which the facts were nearly identical with the facts here, the South Dakota Supreme Court determined that its usury law governed retail charge accounts between its residents and Spiegel, Inc. State ex rel. Meierhenry v. Spiegel, Inc., 277 N.W.2d 298 (1979), app.dism. sub nom. Spiegel, Inc. v. South Dakota, etc., 444 U.S. 804, 100 S.Ct. 25, 62 L.Ed.2d 17 (1979). There, as here, the parties had entered an agreement providing that Illinois law would govern. The result was the exaction of charges in excess of the South Dakota statute. The court found that the following statute constituted a sufficient legislative expression of the public policy of South Dakota that all, including wholly out-of-state retailers, were subject to the South Dakota law:
Notwithstanding any other provision of law to the contrary, the highest rate of interest which it shall be lawful for any person to take, receive, retain or contract for in this State pursuant to the provisions of § 54-11-5 on any revolving charge account shall be twelve per cent per annum.... [S.D.C.L. 54-11-6]
While the statute said nothing specific about extraterritorial application, the unanimous opinion held:
The purpose of the usury law ... is to protect the general welfare of South Dakota citizens by preventing the exaction of excessive rates of interest in revolving charge account agreements. To permit the governing law agreement between the parties to control the determination of whether or not South Dakota substantive law will apply would allow a foreign corporation the privilege of conducting its business in South Dakota upon more favorable conditions than are afforded to South Dakota corporations and would provide an effective *604 means of circumventing legislation designed to protect citizens of South Dakota. This is clearly against the express public policy of this state as embodied in SDCL 54-11-6 and Rollinger, supra [Rollinger v. J.C. Penney Company, 86 S.D. 154, 192 N.W.2d 699 (Sup.Ct. 1972), holding charges on revolving charge accounts were subject to usury statute]. Therefore, we hold that the strong public policy in South Dakota regarding maximum interest rates allowable in revolving charge account agreements invalidates the governing law agreement of the parties which allows for a usurious rate of interest to be taken in South Dakota.... [277 N.W.2d at 301]
It is apparent to us that the Legislature intended our statute to have extraterritorial application. As was said in connection with a different statute in Alexander v. N.J. Power & Light Co., 21 N.J. 373 (1956):
... This was, by every reasonable standard, the legislative concept; there is no ground for supposing the purpose is unexpressed; it is there by clear intendment; it is intrinsic in the statutory policy itself. A statute often speaks as plainly by inference, and by means of the purpose which underlies it, as in any other manner. That which is clearly implied is as much a part of the law as that which is expressed. Brandon v. Montclair, 124 N.J.L. 135 (Sup.Ct. 1940), affirmed 125 N.J.L. 367 (E.&A. 1940). [at 379]
Accordingly, the agreement of the parties to be bound by the law of Illinois is unenforceable as the public policy of this State dictates otherwise. Crinnion v. Great Atlantic & Pacific Tea Co., supra, 156 N.J. Super. at 483; Knollmeyer v. Rudco Industries, Inc., supra, 154 N.J. Super. at 312-313; Restatement, supra, § 187(2).
Defendants insist that in any event plaintiffs are not entitled to summary judgment because "defendant did not know that its charges were unauthorized since it justifiably believed it was not subject to the Act."[5] Additionally, Spiegel argues that plaintiff Pflumm has not yet "proved that the sums actually charged in her case were in excess of what was authorized by the Act." The latter argument has merit. The possibility of a factual question as a result of the application of the terms of the contract, despite its apparent violation of the New Jersey limits, appears. This can be explored on our remand.
*605 But the suggestion that the word "knowingly" in N.J.S.A. 17:16C-54 discharges defendants from culpability is without merit. It is the charge, the contract, the receipt of the excess monies, which are modified by the provision for scienter, not, as defendants argue, the offense to the act. Hays v. Hudson, 85 N.M. 512, 514 P.2d 31, 32 (Sup.Ct. 1973); State ex rel. Turner v. Younker Bros., Inc., 210 N.W.2d 550, 564 (Iowa Sup.Ct. 1973). We see no reason why a retail seller  and especially one as experienced in these matters as are defendants here  should be permitted unilaterally to indulge a presumption that because the act contains no express words of extraterritorial application, the foreign retail seller is insulated from operation of that law.
The trial judge erred in not entering partial summary judgments declaring defendants' amenability to RISA. R. 4:46-2 and -3.
Having said this we would add that we are satisfied, however, that with the exception of plaintiffs' claims, the effect of our pronouncement should be applied only prospectively, as argued by both defendants.
The overruling of prior judicial construction of a statute is generally not given retroactive effect, even as legislative change itself normally applies only prospectively. 20 Am.Jur.2d, Courts, § 234 at 562-563. Although we are not literally altering precedent, the principle in this matter of first impression appears to us to be indistinguishable in view of that which appears almost incontestably to have been a not wholly unreasonable reliance on a contrary doctrine. Rollinger v. J.C. Penney Co., 86 S.D. 154, 192 N.W.2d 699, 704-705 (Sup.Ct. 1972). Any number of New Jersey cases have dealt with this and similar situations. Matters limiting holdings to prospective application (at least with respect to all except the involved plaintiffs) include, for example, Tomarchio v. Greenwich Tp., 75 N.J. 62 (1977), Pascucci v. Vagott, 71 N.J. 40 (1976), Neptune City v. Avon-by-the-Sea, 61 N.J. 296 (1972), and Goldberg v. Traver, 52 N.J. 344 (1968). See State v. Hatch, 64 N.J. 179 (1973).
*606 Our Supreme Court discussed the approaches respecting retroactivity-or-not at length in State v. Nash, 64 N.J. 464 (1974). It concluded:
The question of which approach to retroactivity will be taken in a given case is not answered by any constitutional mandate. E.g., Linkletter v. Walker, supra [381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965)]; State v. Smith, 37 N.J. 481 (1962), cert. den. 374 U.S. 835, 82 S.Ct. 1879, 10 L.Ed.2d 1055 (1963). Rather, under the view adopted by the United States Supreme Court, the competing considerations in each case are weighed by examining (1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice. This weighing process has generally been followed in New Jersey; see, e.g., State v. Johnson, 43 N.J. 572 (1965), aff'd 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Darrow v. Hanover Twp., 58 N.J. 410 (1971); State v. Koch, supra [118 N.J. Super. 421 (App.Div. 1972), final judgment entered in 119 N.J. Super. 184 (App.Div. 1972)]. [at 470-471]
A weighing of these competing considerations and others of perhaps less significance but more specific and of greater applicability to the commercial situation, in the totality of the circumstances of this matter, satisfies us that the rule we here announce should have only prospective application, excepting, for the moment, the present plaintiffs. As a matter of first impression and perhaps unexpected impact, a denial of retroactive application is fully justified. Willingboro Tp. Bd. of Ed. v. Willingboro Emp. Ass'n, 178 N.J. Super. 477, 480 (App.Div. 1981).
Such a determination concludes as well plaintiffs' complaint with regard to the failure of the trial judge to certify this as a class action. Our holding is prospective only. The Legislature amended the law, effective March 31, 1981. The matter is moot except, perhaps, with respect to these plaintiffs.
On the other hand, we believe these plaintiffs, who gave this court the reason and opportunity to examine the problem and effectuate the will of the Legislature, should not be deprived of the fruits of their personal victory by our procedural rule of prospective application. "[U]nless the immediate litigant can hope to gain, there would be no incentive to challenge existing practices or prior holdings which, in the public interest, ought to be reviewed." Goldberg v. Traver, supra, 52 N.J. at 347. As *607 Chief Justice Weintraub pointedly commented in Willis v. Cons. & Ec. Dev. Dep't, 55 N.J. 534, 541 (1970). "As to the plaintiffs in this case, the decision should be so applied, and this for the practical reason that case law is not likely to keep up with the needs of society if the litigant who successfully champions a cause is left with only that distinction."
Pursuant to all of the foregoing, we reverse and remand for a plenary hearing on the issues involved in determining whether the time price differential charged for each monthly billing period exceeded the statutory limits of N.J.S.A. 17:16C-44.1 as that statute read during the periods in question, and if it did, the extent of the unauthorized costs or charge.
We observe that defendant Aldens, Inc., in its answer, asserted a "conditional counterclaim" against plaintiff Robert W. Turner. Unless that has since been expressly waived or abandoned, it should be tried at the same time as the other matters.
Reversed and remanded. Costs to plaintiffs.
NOTES
[1] We earlier denied a motion for consolidation. We are now satisfied that determination was improvident.
[2] The matter is made somewhat more complicated by the fact that since oral argument of this appeal the Legislature has amended N.J.S.A. 17:16C-44.1 in essence to remove the ceiling on the time price differential and to substitute therefor "an amount agreed to by the retail seller ... and the retail buyer." L. 1981, c. 103, § 14. No matter. It remains that it was the earlier statute which was operative during the period concerned in the complaints herein and it is that one we are called upon to construe.
[3] At the time of that decision, as noted in the opinion, there was awaiting signature by the Governor a bill limiting finance charges, which bill had passed unanimously in the Senate and the General Assembly.
[4] In view of the argument in Spiegel's brief that extraterritorial application to retail charge accounts would "be to disregard completely the Act's intent to treat retail installment contracts and retail charge accounts in the same manner," we feel constrained to comment that we do not here decide, or even discuss the meaning of "entered into in this State" as that phrase is used in N.J.S.A. 17:16C-1(b).
[5] The quotation is from the Spiegel brief. Aldens forwards the same argument.